# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **RODNEY WATTS, personal representative of the estate of LEIAH WATTS; C.W., by and through his father and next best friend, RODNEY WATTS; J.W., by and through his father and next best friend RODNEY WATTS; CURTIS WATTS, personal representative of the estate of EVELYN WATTS; BARRY MCBURNETT, personal representative of the estates of FAYE HOWARD and MARY ADAIR; RENEE STONE, individually and as mother and next best friend of V.S.; and TAMMY MCBURNETT, individually,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) ) | **Case No.: 1:17-CV-1454-VEH** |
| **FARMERS INSURANCE EXCHANGE; FARMERS GROUP, INC.; MID-CENTURY INSURANCE CO.; and Fictitious Parties 1, 2, 3, and 4,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION AND PROCEDURAL HISTORY[1]

Plaintiffs bring this case against Defendants Farmers Insurance Exchange (the "Exchange"), Farmers Group Inc. (the "Group"), and Mid-Century Insurance Co. ("Mid-Century") (collectively the "Defendants") (Doc. 23). It was originally filed in the Circuit Court of Talledega County, Alabama. (Doc. 1-1 at 15). It was subsequently removed to the Northern District of Alabama on August 28, 2017. (Doc. 1). Following oral argument on previously filed motions to dismiss, Watts filed his Amended Complaint on November 30, 2017. (Doc. 23).

The Defendants then filed two motions to dismiss and one motion to strike on December 14, 2017. (Docs. 24, 25, 26). First, the Defendants filed a Motion To Dismiss Watts's claims based on fraud. (Doc. 24). Second, the Defendants filed a Motion To Dismiss Watts's claims based on breach of contract and bad faith. (Doc. 25). Third, the Defendants filed a Motion To Strike one of the exhibits attached to the Amended Complaint. (Doc. 26). The parties have responded (Docs. 30, 31, 32) and replied (Docs. 34, 35, 36). The Court held oral argument on these issues on October 18, 2017, and on April 25, 2018. Accordingly, the motions are ripe for review.

---

[1] To protect their privacy, the parties must abbreviate the names of minors in all future documents filed with the Court.

## II.   RELEVANT BACKGROUND

The following relevant background is copied verbatim from the Amended

Complaint:

### STATEMENT OF FACTS; THE UNDERLYING ACCIDENT

16. On or about July 16, 2016, Leiah Watts was driving a 2014 Ford Expedition Truck on Alabama Highway 21 in Winterboro in Talladega, County, Alabama. Traveling with her as passengers were the following family members: M. Faye Howard, Mary Adair, Evelyn Foshee Watts, Tammy McBurnett, Renee Stone, [C.W.], [J.W.] and [V.S.].

17. In the afternoon, while the Watts family was traveling on Alabama Highway 21 in Winterboro in Talladega County, Alabama around 1:40 in the afternoon, the Expedition in which they were riding was struck by a vehicle driven by Wiley Marsh "Pete" Whitworth.

18. Wiley Mash "Pete" Whitworth was the "at fault" driver in the accident; that is, Mr. Whitworth was the sole cause of the accident. The Alabama Uniform Traffic Crash Report, attached hereto as Exhibit B, states that Mr. Whitworth's vehicle was the "primary contributing unit." See, Exh. B., p. 1. Mr. Whitworth's liability insurance, State Farm, has offered its policy limits in this case, tacitly recognizing that Mr. Whitworth is at fault in the accident. See, Exh. C. In addition, representatives of the Defendants have stated that, with respect to the UM coverage at issue in this lawsuit, this case is a policy limits case. See, Exh. D.

19. Liability in this case is, therefore not contested.

20. As a result of this accident, the plaintiffs and/or their decedents suffered the following injuries:

    a) Leiah Gatlin Watts was killed;

b) M. Faye Howard was killed;

c) Mary Adair was killed;

d) Evelyn Foshee Watts was killed;

e) Tammy McBurnett suffered severe injuries that have required, to date, over twenty separate surgeries;

f) Renee Stone suffered serious injuries to her collarbone and arm as well as soft tissue injuries all over her body and nerve damage;

g) [C.W.] suffered serious injuries including a broken arm and lacerations to his head;

h) [V.S.] suffered serious psychological injuries as a result of being within the zone of danger at the time of the collision and watching the deaths and injuries of family members that included her grandmother, aunts and mother;

i) [J.W.] suffered serious psychological injuries as a result of being within the zone of danger at the time of the collision and watching the deaths and injuries of family members that included his grandmother, aunts and mother.

## STATEMENT OF FACTS: UNDERINSURED MOTORIST COVERAGE UNDER THE FARMERS/MID-CENURY POLICY

21. At the time of the accident, Rodney Watts and Leiah Watts had in full force and effect an automobile insurance policy issued and underwritten by Mid-Century Insurance Company, policy number 19292-84-84. The policy included UM/UIM coverage and insured a total of five vehicles. The policy was issued on June 18, 2016.

22. Under an intercompany insurance pooling agreement, Farmer's Exchange agreed to assume 51.75% of all premiums, risks and liabilities accrued by Mid-Century Insurance Company, while Mid-Century

Insurance Company assumed 16% of all premiums, risks and liabilities accrued under its policies, including the policy issued to Rodney and Leiah Watts.

23. Upon information and belief, Farmer's Group, Inc. provided all administrative services in reference to the Watts' policy, including but not limited to the writing of the insurance policy, collection of premiums and evaluation of claims.

24. Rodney Watts purchased the automobile insurance policy from Farmers' agent, Nicole Ponder, in Oxford, Alabama. The purchase was done over the phone before the policy was issued on June 16, 2018. Rodney Watts talked to the agent about the policy. Rodney Watts told the agent that because the Watts' owned the Expedition, which was one of the vehicles he was getting insurance on, they often had a lot of extended family members riding with them on family trips, and he wanted to be sure they were protected in the event of an accident.

25. The agent went over the amount of liability and collision and other coverages and the terms of the policy that Rodney Watts was purchasing. When the agent got to the UIM section of the policy, she told Rodney Watts that he had five cars insured and that he had UIM coverage for all five cars and for all people in the vehicle. She assured him that all persons riding in any of the insured vehicles, including the Expedition, would have UM coverage up to $150,000 per person in the event of an accident.

26. When Rodney Watts received the policy, he read the policy, including endorsements. Based upon his attempt to read the policy and the wording of the policy written by Farmers Group, Inc. employees for Mid-Century Insurance Company, it looked like what the agent told him was the truth.

27. In the Alabama endorsement to the policy that sets forth the applicable uninsured motorist limits, the policy explains the following:

(1) The limit of liability for Uninsured Motorist coverage

stated in the Declarations for each person for the occupied insured car, plus the sum of the highest limits of liability for Uninsured Motorists coverage stated in the Declarations for each person applicable to any other insured car on the policy, up to a maximum of two additional limits, is our maximum limit of liability for all damages.

While the policy does list a maximum limit of liability per accident in the amount of $100,000 plus two additional coverages for a total of $300,000, the policy also explains that that maximum limit is "subject to the limit for each person" which means the $150,000 per injured person limit trumps the maximum liability language.

28. The Alabama Uninsured Motorist Statute also provides that an insurance company may only legally restrict stacking under a single policy covering multiple vehicles to two coverages per injured person. § 32-7-23(c), Code of Alabama (1975).

29. After the terrible accident on July 16, 2016, Rodney Watts was told for the first time that he only had coverage for three vehicles for everyone in the vehicle rather than five and that the Defendants refused to pay $150,000 per death or injury but rather insisted that the most they owed for all of the deaths and injuries in the accident combined was $300.000.00.

30. Had Rodney Watts known that the Defendants would only pay on three coverages, he would have obtained different insurance coverages in different amounts.

31. The deaths and injuries listed above were caused by an underinsured motorist as that term is defined in § 32-7-23(b)(4), Code of Alabama (1975). Accordingly, each person injured, or each estate of an individual killed in the accident is entitled to receive up to $150,000 under the Farmers Insurance automobile policy. By unlawfully restricting the amount offered to the injured individuals and the decedents' estates to a total of $300,000, the Defendants are breaching the duty of good faith

and fair dealing they owe to their insureds.

(Doc. 23 at 5-9).

### III.    STANDARD

#### A.    Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* FED. R. CIV. P. 12(b)(6) ("[A] party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting FED. R. CIV. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* FED. R. CIV. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (emphasis added). "Under *Twombly*'s construction of Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line from conceivable to plausible.' *Ibid.*" *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

8

## B.     Rule 12(b)(1)

Here is the relevant 12(b)(1) standard in the Eleventh Circuit:

Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms. "Facial attacks" on the complaint "require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)). "Factual attacks," on the other hand, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*

These two forms of attack differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). But when the attack is factual,

the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Id.* at 412–13 (quoting *Mortensen*, 549 F.2d at 891).

*Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990).

## IV. ANALYSIS

### A. Motion To Strike

The Defendants moved to strike the accident report attached to the Amended Complaint and "Paragraph 18 of the First Amended Complaint." (*See* Doc. 26 at 1-3). They argue that "any reference or comment regarding the accident report is improper and prejudicial." (*Id.* at 2) (citing *Plenkers v. Chappell*, 420 So. 2d 41 (Ala. 1982)). In response, the Plaintiffs note that this case is just at the pleading stage, not trial. (*See* Doc. 32 at 1). They argue that the Motion To Strike is due to be denied. (*See id.* at 2). The Court agrees.

Here is the relevant rule regarding motions to strike:

> Federal Rule of Civil Procedure 12(f) provides that a Court can order "any redundant, immaterial, impertinent, or scandalous matter" to be stricken from a pleading. *See also* Ala.R.Civ.P. 12(f) ("Upon motion made by a party before responding to a pleading ... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). District courts have been bestowed a wide range of discretion in disposing of motions to strike. *Resolution Trust Corp. v. Youngblood*, 807 F.Supp. 765, 769 (N.D.Ga.1992) (citations omitted). Moreover, motions to strike "are not favored in the federal rules," and should not be granted unless clearly warranted. *Id.* (citations omitted). Indeed, " 'motions to strike cannot be used to determine disputed fact questions, nor can they be used to decide disputed and substantial questions of law, particularly where there is no showing of prejudice to the movant.' " *Id.* (citations omitted); *cf. William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2nd Cir.1984) ("[E]ven when the defense presents a purely legal question, the courts are very reluctant to determine disputed

or substantial questions of law on a motion to strike; these questions quite properly are viewed as determinable only after discovery and a hearing on the merits. To do otherwise would be to run the risk of offering an advisory opinion on an abstract and hypothetical set of facts."), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). Therefore, a motion to strike "will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Beaulieu v. Board of Trustees of University of West Florida*, 2007 WL 2900332, *5 (N.D.Fla.2007) (citation omitted).

*Miller v. Southeast Supply Header, LLC*, No. CA 09-0067-KD-C, 2010 WL 55637, *8 (S.D. Ala. Jan. 4, 2010) (DuBose, J.).

In this case, Defendants have not made the requisite showings described above. Their citation to *Plenkers* is not instructive because that case did not say that it is improper to attach an accident report to a pleading. *See Plenkers*, 420 So. 2d at 45. Their citation to the statute similarly does not control this situation because the statute refers to trials, not pleadings. *See* Ala. Code § 32-10-11 ("No such report shall be used as evidence in any trial, civil or criminal, arising out of an accident."). Further, the Defendants have not cited a single case where a district court has granted such requested relief. The Court declines to do so here. Accordingly, the Motion To Strike is **DENIED**.

**B.    Motion To Dismiss Watts's Fraud-Based Claims**

**1.    The Filed-Rate Doctrine Does Not Apply**

The Defendants claim that the Filed-Rate Doctrine bars the Plaintiffs' fraud claims against them. (Doc. 24 at 13). They argue that "[t]he filed-rate doctrine is activated when one challenges a matter within the purview of a state regulatory agency." (*Id.*) (emphasis omitted). With that in mind, they state that "[t]he regulatory scheme of the [Alabama Department of Insurance] governs any issue relating to insurance policy forms and rates upon which premiums are based." (*Id.* at 14) (emphasis omitted). Then, Plaintiffs' "alleged fraud-based claims present a challenge to the rates and policy forms approved by the commissioner." (*Id.* at 19) (emphasis omitted). In support, they cite *Ex parte Cincinnati Ins. Co.* (*See* Doc. 24 at 22) (citing *Ex parte Cincinnati Ins. Co.*, 51 So.3d 298, 311 (Ala. 2010)).

The Supreme Court of Alabama has defined the Filed-Rate Doctrine:

> The filed-rate doctrine limits judicial review of rates that have been approved by regulatory agencies. Describing the doctrine in a case involving an insurance rate approved by the commissioner, this Court has stated: "The filed-rate doctrine provides that once a filed rate is approved by the appropriate governing regulatory agency, it is per se reasonable and is *unassailable in judicial proceedings*." *Birmingham Hockey Club, Inc. v. National Council on Compensation Ins., Inc.*, 827 So.2d 73, 78 n. 4 (Ala.2002) (emphasis added).

*Ex parte Cincinnati*, 51 So. 3d at 305-306.

As an initial matter, the Court must first determine whether to analyze this argument under Rule 12(b)(6) or 12(b)(1). Defendants note that Alabama courts treat it as a matter of subject matter jurisdiction, but argue that federal courts tackle it under Rule 12(b)(6). (*See* Doc. 24 at 22, n. 8). However, the case cited by the Defendants, *Allen*, gives no indication why it approached the case under 12(b)(6) (as opposed to 12(b)(1)). *See Allen v. State Farm Fire & Cas. Co.*, 59 F.Supp.2d 1217, 1221 (S.D. Ala. 1999) (Cassady, M.J.). For that reason, the case is of very limited utility to this Court. The Court notes that the Supreme Court of Alabama has spoken on this issue. *See Ex parte Cincinnati Ins. Co.*, 51 So. 3d at 306. The Supreme Court of Alabama stated very clearly that "[t]he bar of the filed-rate doctrine goes to the court's jurisdiction over the subject matter." *See id.* (citing other sources). The Court made that clear, even while citing the *Allen* court. *See id.* Since this Court believes that an Alabama state court would approach this as a question of subject matter jurisdiction, this Court will do so as well.

The Court notes that the Defendants have not cited a single federal decision applying the Filed-Rate Doctrine in the manner that they urge upon this Court. (*See* Doc. 24 at 13-24).[2] The Court's independent research also has found not such

---

[2] The *Allen* case was a filed-rate case, but it was not a fraud case. *See generally Allen*, 59 F.Supp. 2d at 1221 ("Plaintiffs have asserted causes of action for breach of contract, interference with contractual business relations, conspiracy, inadequate notice, restraint of trade and unjust

authority. The Court imagines that, if such a doctrine was truly a viable defense against fraud, it would come up time and time again under analogous circumstances. However, without a citation to another federal court applying the doctrine in the requested manner, and having reviewed relevant Alabama court decisions, this Court declines to stretch the doctrine so far. Importantly, "[u]nder the *Erie* doctrine, a federal court adjudicating state law claims applies the substantive law of the state." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477(1941)).

The Court now examines *Ex parte Cincinnati Ins. Co.*, which Defendants rely on to support their filed-rate arguments. (*See* Doc. 24 at 22-24) (citing *Ex parte Cincinnati Ins. Co.*, 51 So. 3d at 311). In that case, the "[plaintiff] asserted claims of breach of contract, fraudulent misrepresentation, fraudulent suppression, and unjust enrichment." *See Ex parte Cincinnati*, 51 So. 3d at 301. It is important to understand that plaintiff's theory of the case. *See id.* at 308. The court explained:

> The first sentence of Peacock's complaint states: "This action challenges [Cincinnati's] systematic and ongoing practice of *improperly imposing and collecting premiums* for certain [UM] insurance coverage when issuing multi-vehicle auto insurance policies in the State of Alabama." (Emphasis added.) Peacock also alleges repeatedly that Cincinnati

enrichment.") (citation omitted).

14

> "*overcharg[es] for UM coverage*" and *"charg[es] more than is necessary* to provide maximum UM coverage under the contract." (Emphasis added.) Peacock contends that Cincinnati receives "improper gains ... at the expense of insureds and premium payors." As noted above, Peacock seeks damages only in the form of restitution of premiums paid for the allegedly illusory UM coverage.

*Id.* Importantly, on his fraud-based claims, the plaintiff only sought restitution and other similar remedies. *See id.*

While the Court is fully willing to apply the Filed-Rate Doctrine in the appropriate circumstances, the Defendants have not convinced this Court that this is a filed-rate case.[3] To understand why, it is important to understand the Plaintiffs' theory of <u>this</u> case. (*See generally* Doc. 30). These Plaintiffs' "fraud claims do not center on a claim that their insurance premiums were too high; [they] center on the Defendants misrepresenting key terms in the insurance policy itself." (*Id.* at 7). This fraud was allegedly perpetrated through the representations of the Defendants' agent to Rodney Watts when he bought the policy. (*See* Doc. 23 at ¶¶ 24-25). The Plaintiffs are not alleging that the rates were too high; rather they are arguing that the Defendants said they were selling Watts one policy (that gave him a certain amount of coverage), but they were really selling him another policy (with far less coverage

---

[3] The Plaintiffs cite to the Supreme Court of Alabama in *Peachtree*, but that case is of limited use. (*See* Doc. 30 at 6-7) (citing *Peachtree Cas. Ins. Co., Inc. v. Sharpton*, 768 So.2d 368 (Ala. 2000)). There the Court not surprisingly noted that when the "case is not a rate case; the filed-rate doctrine is inapplicable." *See Peachtree*, 768 So.2d at 373.

than promised). (*See id.* at 26-30). This case is unlike *Ex parte Cincinnati* because here the Plaintiffs are not arguing they were overcharged for illusory coverage; they argue that the Defendants misrepresented the policy they were selling. (*See id.* at 9-14). Additionally, the Plaintiffs here seek compensatory and punitive damages, not restitution, disgorgement, or a constructive trust. (*See id.* at 14).

For that reason, the Motion To Dismiss the fraud-based claims based on the Filed-Rate Doctrine is **DENIED**.

## 2. Plaintiffs Have Plausibly Pled Fraud Against the Exchange but Not the Group[4]

The Defendants also argue that, even without the Filed-Rate Doctrine, the Amended Complaint should still be dismissed against the Exchange and the Group. (*See* Doc. 24 at 24). The Defendants argue that Nicole Ponder was an agent for Mid-Century alone, and for that reason the Exchange and the Group should be dismissed. (*See id.* at 24-26) (citing Doc. 20 at 34). The Plaintiffs reject the premise of the Defendants' argument. (*See* Doc. 30 at 12). They argue that "Ponder was a Farmers' agent." (*See id.*) (citing Doc. 23 at ¶24) (emphasis omitted).[5]

---

[4] The Defendants note that Mid-Century is only arguing on the filed-rate grounds. (*See* Doc. 35 at 10).

[5] Plaintiffs also rely on the Supreme Court of Alabama in *Alfa Mutual Ins. Co.* (*See* Doc. 30 at 13-15) (citing *Alfa Mutual Ins. Co. v. Roush*, 723 So. 2d 1250 (Ala. 1998)). The *Alfa* case was about the scheme perpetrated by an insurance agent where he pocketed premiums and did not actually sell the insurance he purported to sell. *See Alfa*, 723 So.2d at 1252-55. The facts of

16

At this stage, it would be improper for the Court to make factual determinations in favor of the Exchange, *i.e.* that Ponder was not their agent.[6] The Amended Complaint clearly states that "Watts purchased the automobile insurance policy from Farmers' agent, Nicole Ponder, in Oxford, Alabama." (Doc. 23 at 7).[7] It is possible for an agent to have two principals. *See* RESTATEMENT (3D) OF AGENCY § 3.14 to 3.16 (2006). The Amended Complaint sufficiently pleads Ponder's alleged fraud and pleads that Ponder acted as the Exchange's agent. For that reason, the Motion To Dismiss the fraud claims against the Exchange as being insufficiently pled is **DENIED**.

However, the Court also notes that the Amended Complaint insufficiently pleads fraud against the Group. (*See* Doc. 23 at 6-14). The Plaintiffs argue that it is enough that they allege that:

> Farmer's Group, Inc. handles the administrative details required in the issuing of policies, premium payments and claim evaluations for both Farmers Insurance Exchange and Mid-Century Insurance Company.

*Alfa* are obviously very different from the present case, and, as the Defendants point out, the case does not directly tackle the issue of whether a pool insurer could be liable. (See Doc. 35 at 8-10). For that reason, this case warrants no further discussion.

[6] Also, the Court will not conclude that the policy was not the Exchange's policy as well. There are arguments to support the idea that it was the Exchange's policy in addition to being Mid-Century's policy.

[7] Having two entities with the word "Farmer" can be confusing at times. However, the Court understands "Farmers'" refers to the Exchange in this context. (*See* Doc. 23 at ¶ 14).

Doc. 23, ¶ 13. These duties included the drafting of the language in the policy at issue in this case. Doc. 23, ¶ 26.

(Doc. 30 at 13). However, the Amended Complaint does not specify what the Group did to further the fraud, especially when the crux of that fraud appears to be based upon the oral representations from Ponder. (*See* Doc. 23 at 6-9); (*see also id.* at 7 ¶25). Rule 9(b) states that:

> **(b) Fraud or Mistake; Conditions of Mind.** In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). On this pleading, this Court cannot say that the Plaintiffs have pled fraud against the Group with any sort of "particularity." The pleading does not give a solid indication of what the Group did in this fraud, other than generally allege that they do administrative activities, like writing the policy. (*See* Doc. 23 at ¶¶13, 23, 26). Further, the Amended Complaint is unclear whether it alleges that Ponder acted as an agent for the Group. (*See* Doc. 23 at ¶¶ 21, 24). The Court does not understand Plaintiffs to be arguing that Ponder worked for the Group; here, Plaintiffs seem to be alleging that Ponder committed fraud in selling the Exchange's and Mid-Century's policy (not a Group policy). (*See id.* at 6-9); (*cf.* Doc. 22 at 7). The Court is unpersuaded by Plaintiffs' argument that the Group should be held liable for fraud merely because they earned "management fees" through its business relationships

18

with the other two entities. The Plaintiffs' theory of liability for roping in the Group is too undefined to pass Rule 9(b). Accordingly, the fraud claim is **DISMISSED** against the Group.

### C.    Motion To Dismiss the Breach of Contract and Bad Faith Claims

### 1.    The Breach of Contract Claim Is Not Ripe

There are several arguments raised in the motion based on arguments over what entities were parties to the Policy. (*See* Doc. 25 at 4-10). The Court does not need to reach these arguments because of Mid-Century's arguments that go to ripeness. The Court sees no reason why Mid-Century's arguments would not be equally applicable to the Exchange or Group, so the Court addresses ripeness as to all three defendants together. Mid-Century argues that "[t]he first amended complaint fails to include all of the elemental requirements for [a breach of contract] claim" i.e. "fault on the part of the tortfeasor . . . extent of their damages." (*See* Doc. 25 at 20-21) (emphasis omitted).

In response, the Plaintiffs cite to two cases. (*See* Doc. 31 at 5-9) (citing *Progressive Specialty Insurance Co. v. Smith*, No. CA 14-00320-KD-C, 2014 WL 7204875, *5 (S.D. Ala. Dec. 17, 2014); *Ex Parte Safeway Ins. Co. of Alabama, Inc.*, 148 So.3d 39, 40 (Ala. 2013) (hereinafter "*Safeway II*"). However, the *Progressive* case does not apply here because that case was not an uninsured motorist case. *See*

*Progressive*, 2014 WL 7204875 at *5.[8]  Additionally, the *Safeway II* case does not control the outcome here because that case involved an unknown tortfeasor; here, the tortfeasor is known. *See Safeway II*, 148 So.3d at 40.

First, the Court must address is whether this challenge is under Rule 12(b)(6) or 12(b)(1). Mid-Century would have the Court believe that it is under Rule 12(b)(6). (*See* Doc. 34 at 9) (citing *Safeway II*). It is unclear what the Plaintiffs' position is on this, but, either way, they argue that the claims are not premature. (*See* Doc. 31 at 5-8). The Court will not let the parties' characterizations of the Motions upend the true nature of what is going on. *See Andersen v. Omni Ins. Co.*, No. 1:13-CV-2163-VEH, 2014 WL 838811, *1 n. 3 (N.D. Ala. Mar. 4, 2014) (Hopkins, J.) (disregarding how the movant labeled the motion under 12(b)(6) and proceeding with a 12(b)(1) analysis). This case is controlled by *Safeway I* because the tortfeasor is known. *See Broadway v. State Farm Mut. Auto. Ins. Co.*, 4 F.Supp.3d 1271, 1280 (M.D. Ala. 2014). For that reason, the proper standard is under 12(b)(1). *See id.* ("If the Alabama Supreme Court had intended to change the holdings of *Pontius* and *Safeway I* that courts lack subject matter jurisdiction over breach of contract and bad faith claims involving UIM benefits where liability and damages are not established, then the *Safeway II* court would have overruled those cases.") (citing *Andersen*, 2014 WL

---

[8]  Plaintiffs concede that this case is not directly applicable. (*See* Doc. 31 at 7).

838811).

Next, the Court will discuss the relevant law. This Court's previous discussion

in *Andersen* is instructive:

> [E]ven though [the plaintiff] has already settled with the tortfeasor who caused the collision, the undisputed fluidity and still speculative nature of [the plaintiff's] medical damages means that her bad faith claim is due to be dismissed without prejudice consistent with *Pontius* and *Safeway I*.
>
> > We agree with State Farm that Pontius's breach-of-contract and bad-faith claims were not ripe for adjudication. *Without a determination of whether liability exists on the part of the underinsured motorist and the extent of the plaintiff's damages, a claim of bad-faith failure to pay or breach of contract is premature*. The trial court properly dismissed the claims because the claims were not ripe for adjudication. However, as discussed earlier, State Farm's motion challenges the subject-matter jurisdiction of the court. A dismissal for lack of subject-matter jurisdiction does not operate as an adjudication on the merits. *See Ex parte Capstone Dev. Corp.*, 779 So.2d 1216 (Ala.2000) (a dismissal for lack of subject-matter jurisdiction is treated as a dismissal without prejudice to the plaintiff's right to reinstitute the action). Therefore, the trial court should have dismissed Pontius's breach-of-contract and bad-faith claims without prejudice. *See also Stringfellow v. State Farm Life Ins. Co.*, 743 So.2d 439 (Ala .1999) (insured's unripe fraud action should properly have been dismissed without prejudice in order to allow the insured to bring the action when it presented a justiciable controversy). Therefore, the judgment of dismissal is modified to provide that the dismissal of Pontius's breach-of-contract and bad-faith claims is without prejudice to Pontius's right to refile those claims.

We recognize that Pontius has now resolved her underlying lawsuit against the Martins. Based on *LeFevre*, there can be no bad-faith action based on conduct arising before the uninsured motorist's liability is established and damages are fixed; therefore, "there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct." 590 So.2d at 159. Accordingly, any claims alleging bad-faith failure to pay an insurance claim or breach of contract based on State Farm's failure to pay UIM benefits must be based on conduct arising *after the Martins ['] liability was established and damages fixed*.

*Pontius*, 915 So.2d at 564–65 (emphasis added); *see also Safeway I*, 990 So.2d at 352 ("Safeway has established a clear legal right to a writ of mandamus because Safeway presented unrefuted evidence indicating that the damages are in dispute and, in accordance with Pontius, Galvin's bad-faith claim, as a matter of law, is not ripe; consequently, the trial court does not have subject-matter jurisdiction over the claim."). *But see Ex parte Safeway Ins. Co.*, No. 1120439, —— So.3d ——, 2013 WL 5506557, at *4 (Ala. Oct. 4, 2013) (Moore, C.J.) (hereinafter *"Safeway II "*) (denying petition for writ of mandamus filed by insurer and questioning, declining to apply, and distinguishing, but not expressly overruling, holding in *Pontius* with respect to insured's uninsured motorist benefits claim involving phantom driver).

*Andersen*, 2014 WL 838811, *3 (internal footnote omitted).

The Court must determine whether the Plaintiffs' claims are premature. Since the Court concludes that Plaintiffs' damages are not established, the Court does not need to reach the question of whether liability is established.

The Amended Complaint notes that four Plaintiffs died in the accident. (Doc. 23 at ¶20). The Defendants note that "the only damages recoverable for a wrongful

death are punitive damages." (*See* Doc. 25 at 21) (citing another source). They go on to say that "[b]y their very nature, such damages are uncertain in their extent and calculation until such time as a finder of fact determines them." (*See id.*) (emphasis omitted). The Supreme Court of Alabama has noted the difficulty in proving damages in these cases:

> With only punitive damages recoverable in wrongful death cases and with no standards for determining excessiveness or inadequacy (if such damages can be inadequate in wrongful death cases, *Louisville & N.R.R. v. Street*, supra) except what trial or appellate courts consider to be awards of amounts that indicate prejudice or passion, *Trahan v. Cook*, 288 Ala. 704, 265 So.2d 125 (1972); <u>it is doubtful that an insured could ever prove the amount of an insurer's liability under uninsured motorist coverage in a wrongful death case with the specificity necessary to recover against an insurer for bad faith</u> in failing to negotiate or pay a wrongful death claim under uninsured motorist coverage.

*Aetna Cas. & Sur. Co., Inc. v. Beggs*, 525 So. 2d 1350 (Ala. 1988) (emphasis added); *see also Mutual Assur., Inc. v. Madden*, 627 So. 2d 865, 866 (Ala. 1993) (Houston, J., concurring in the result) ("Because of the peculiar nature of damages for wrongful death in Alabama, 'such damages as the jury may assess,' ranging from nothing to $7,500,000 . . . may be recoverable. . . . We have established no minimum limit, even where the defendant's action is intentional; the jury still has the right to award nothing."). The parties can only guess at what a jury would award in the form of punitive damages. The deceased Plaintiffs' damages are not established. Accordingly,

the deceased Plaintiffs' breach of contract claims are **DISMISSED without prejudice** as unripe.

Additionally, the living Plaintiffs' damages are not fixed. *See Andersen*, 2014 WL 838811, *3; *see also May v. Victoria Fire & Cas. Co.*, No. 5:14-CV-924-HGD, 2015 WL 12978621, *2 (N.D. Ala. Mar. 23, 2015) (Kallon, J.) ("Plaintiff never actually alleges the exact amount of her damages or whether the damages are undisputed. Rather, Plaintiff merely alleges that her damages are 'in excess of the $25,000 settlement she reached with the at-fault party's insurance.'"); *Hall v. State Farm Mutual Automobile Ins. Co.*, 2011 WL 13229633, *2-4 (N.D. Ala. Aug. 2, 2011) (finding that the "[plaintiff] conversely has failed to establish which damages he is entitled to recover from the accident"). None of the Plaintiffs' arguments overcome the fact that the damages are not conclusively established. (*See* Doc. 31 at 5-6).

Plaintiffs argue that Defendants will not pay more than $300,000 total and that the $300,000 will be exhausted. (*See* Doc. 31 at 6) (citing Doc. 9-2, 9-3). However, an attorney's statements evaluating his client's legal liability and case valuation do not establish damages. Those letters do not tell the Court how much each Plaintiff was injured. The Plaintiffs also argue that they were given permission to settle with the tortfeasor. (*See id.*). However, that settlement still does not tell the Court how

much each Plaintiff was damaged, it just tells the Court that there was a settlement.

Here, the Plaintiffs plead that damages are somewhere in excess of $300,000. (*See* Doc. 23 at 16 ¶57); (*see also id.* at 5-6 ¶20) (failing to list the amount of damages sustained by each plaintiff). The Court is left to speculate how much in excess of $300,000. The Court also notes that the letter attached to the Amended Complaint, dated August 24, 2016, indicates that Plaintiffs have not submitted "their medical bills and records." (*See* Doc. 23-4 at 1); (*see also* Doc. 25 at 23 n.10) (arguing that the "Plaintiffs fail to (and cannot) plead that they provided the requested information necessary to evaluate the UIM claim"). Additionally, it is unclear if the Plaintiffs are still receiving treatment. (*See* Doc. 23 at 5-6 ¶20). Once the living Plaintiffs submit evidence indicating that the damages are fixed, then they might have a claim. However, until that time, the living Plaintiffs' breach of contract claims are **DISMISSED without prejudice** on ripeness grounds.

### ii.     The Bad Faith Claim Is Not Ripe

The Supreme Court of Alabama has stated the elements of a bad faith claim:

[T]he tort of bad-faith refusal to pay a claim has four elements—(a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence—with a conditional fifth element: "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Bowen*, 417 So.2d at 183.

Thus, for the tort of bad-faith refusal to pay, "[r]equirements (a) through (d) represent the 'normal' case. Requirement (e) represents the 'abnormal' case." *Grissett*, 732 So.2d at 976.

*State Farm Fire & Cas. Co. v. Brechbill*, 144 So.3d 248, 258 (Ala. 2013).

Since the breach of contract claims are not ripe, the bad faith claims are not ripe. Accordingly, Count III is **DISMISSED without prejudice**.

### D.    Leave To Amend the Pleading

Finally, the Court notes that Plaintiffs will be granted one more chance to clearly state an underinsured motorist (UIM) claim. As it stands, the Amended Complaint has three counts (fraud, breach of contract, bad faith). (*See* Doc. 23 at 9, 15). Contrary to Plaintiffs' arguments, the Court does not read the Amended Complaint to clearly raise a claim for UIM. (*See* Doc. 31 at 8-9). Plaintiffs' citations to the Amended Complaint in their response go to the breach of contract count. (*See id.*). If the Plaintiffs wish to add a claim for UIM, then that would be a fourth count. The elements to this claim are enumerated in the Alabama Pattern Jury Instructions. *See* 1 ALA. PATTERN JURY INSTR. CIV. 20.52 (3d ed.). The elements of a UIM claim are different from the elements of a breach of insurance contract claim. *See id.* at 20.17. The Court **GRANTS** the Plaintiffs 30 days to amend their complaint, if they so choose.

## V.   CONCLUSION

In conclusion, the motions are **GRANTED in part** and **DENIED in part**. The Motion To Strike is **DENIED**. The Motion To Dismiss based on the Filed-Rate Doctrine is **DENIED**. Also, the Motion To Dismiss the fraud claims against the Exchange as being insufficiently pled is **DENIED**. The Group's Fraud Motion is **GRANTED**, and the Court **DISMISSES** Count I (fraud) against the Group. Count I remains against Mid-Century and the Exchange.

Additionally, Counts II (breach of contract) and III (bad faith) are **DISMISSED without prejudice** based on ripeness grounds against the Group, Exchange, and Mid-Century.

The stay entered on January 18 (Doc. 37) is hereby **LIFTED**. The Plaintiffs are given 30 days to amend their complaint if they so choose.

**DONE** and **ORDERED** this the 27th day of April, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge